UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
(Richmond Division)

| | |
|---|---|
| _____ )<br>In re )<br> )<br>ROSELAND VILLAGE, LLC, et al., )<br> )<br>Debtors. )<br> )<br>_____) | Chapter 11<br>Case No. 11-30223-KRH<br>Jointly Administered |

_____ )
In re )
 )
G.B.S. HOLDING, LTD., )
 )
Debtor. )
 )
_____)

**JOINT**
**SECOND AMENDED**
**<u>DISCLOSURE STATEMENT</u>**

G.B.S. Holding, Ltd. and Roseland Village, LLC ("Debtors" or "GBS (or GBS Holding)" or "Roseland Village") have prepared and filed this Second Amended Disclosure Statement ("Disclosure Statement") for the purpose of providing creditors herein with adequate information about the Debtors and their proposed plan of reorganization (the "Plan"), which has been filed with the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"), so that creditors may make an informed judgment with respect to the Plan and its approval. A copy of the Plan accompanies this Disclosure Statement.

As a creditor, your acceptance of the Plan is important.  In order for the Plan to be accepted, of those creditors voting, creditors holding at least two-thirds in dollar amount and more than one-half in number of the allowed claims of each class of creditors impaired under the Plan must vote to accept the Plan.

**NO REPRESENTATIONS CONCERNING THE DEBTORS, THE PLAN, OR THE VALUE OF THE DEBTOR'S PROPERTY ARE AUTHORIZED BY THE DEBTORS UNLESS SET FORTH IN THIS DISCLOSURE STATEMENT. ACCORDINGLY, NO REPRESENTATIONS OR**

**INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE, OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD BE RELIED UPON IN EXERCISING YOUR RIGHT TO ACCEPT OR REJECT THE PLAN.**

The information contained herein has not been subjected to a certified audit. Therefore, the Debtors are unable to warrant or represent that this information is without inaccuracy, although great effort has been made to be accurate.

Capitalized words in this Disclosure Statement are defined in Article I of the accompanying Plan, and those definitions are used in this Disclosure Statement.

## I. INTRODUCTION

On August 24, 2011, the Bankruptcy Court entered an Order that consolidated the two separate cases, *In re G.B.S. Holding, Ltd.* (Case No. 11-333708-DOT) and *In re Roseland Village, LLC* (Case No.11-30223-KRH), on a procedural basis. That Order allows the Debtors to file a consolidated Disclosure Statement and Plan of Reorganization.

The reason for the consolidation of the cases is that Roseland Village and GBS jointly own $1,288^{+/-}$ acres adjoining each other that are jointly part of a larger assemblage of land, known as *Roseland,[1]* which has been given approval from Chesterfield County as a Master Planned Development consisting of more than 1.5 million square feet of commercial space and more than 5,600 housing units. Roseland consists of 29 separate parcels that were acquired over a nine (9)-year period. The property is located south of Route 288 at its intersection with Woolridge Road. Development of the assembled parcel will take place in some cases without regard to the property lines of the original 29 parcels that comprise the land titled to GBS and Roseland Village.

## II. BACKGROUND OF THE DEBTORS AND THEIR CHAPTER 11 CASE

A.   Ownership, Origin and Business of Debtors

GBS is owned by George B. "Buddy" Sowers, Jr.; Roseland Village is owned, in equal shares, by GBS and Theresa Sallé, who sold some of the land owned by her family to Roseland Village. Roseland Village owns $345^{+/-}$ acres, and GBS owns the remaining $946^{+/-}$ acres.

Buddy Sowers is one of Chesterfield County's most successful and experienced land developers and has developed many residential subdivisions and commercial properties in and around the Richmond area. Mr. Sowers and his companies have conceived, assembled, entitled and developed industrial parks, mixed-use commercial developments, and dozens of single- and multi-family residential developments. Mr. Sowers has also been responsible for several recreational and park projects around the Richmond area, including the redevelopment of

---

[1] To avoid confusion, the entire development will be referred to herein as *Roseland*. The Debtor Roseland Village, LLC may be referred to herein as *Roseland Village*.

Providence Golf Club; the construction and development of Robious Landing Park in Midlothian; development of Independence Golf Course and academy in Powhatan and the dedication of over 350 acres of park property to the Eppington Foundation in Chesterfield.

Mr. Sowers and his sons, George B. "Casey" Sowers, III and Christian Sowers, have successfully developed properties for decades and have the experience and ability to successfully implement the Plan.  Mr. Sowers and his sons will oversee the activities as proposed in this Disclosure Statement and the Plan.

As stated above, the assemblage of the land of Roseland Village and GBS is for the purpose of developing approximately 1,288$^{+/-}$ acres that is known as *Roseland*.  The Roseland land was assembled through acquisitions that occurred between 1998 and 2008. In most cases, financing was procured by the Debtors for the acquisitions as they were purchased. In 2006, the Debtors began the process of obtaining all of the zoning approvals required to develop the land. The approval process lasted until August of 2008, when Chesterfield County approved the entire site as a Master Planned Development, which permitted the more than 1.5 million square feet of commercial space and more than 5,600 housing units referenced above.

It is important to note that the approval as a Master Planned Development is without regard to the original 29 parcel boundary lines; instead, the development and approvals are based on the entire site's natural contours, outer boundaries and geography. The Debtors cannot simply remove one or more of the 29 parcels that comprise the assembled Roseland without jeopardizing the entire Master Planned Development approval, since the County rezoned Roseland's density based on the development of the entire assembled parcel. Conditions imposed during the zoning process assumed the entire project would be under the control of a single entity.  Many of these conditions require the participation of many, if not all individual parcels in the project prior to the commencement of development on any particular portion of the project.

The Debtors have proposed in their Plan that the existing approval for the Master Planned Development be modified that would in essence satisfy the requirements necessary to proceed with the overall project, and clarify the specific land use requirements and proffers for each of the original boundary lines or development sections based on the land that serves as collateral for each secured loan.  Amendments to the zoning conditions would be sought to allow for specific portions of the development to proceed autonomously and concurrently with specific requirements and their associated costs clearly identified for each respective parcel.

B.    Description of Debtors' Real Property Holdings

The Debtors hold fee simple title to the following parcels of real estate:[2]

---

[2] The parcel numbers are the same as the parcel numbers that are listed on Schedule I attached, which is a map depicting the entire assemblage.

| Parcel | Brief Description |
|---|---|
| **Parcel No. 1**:<br>2.5$^{+/-}$ Acres Land and Improvements at 807 and 815 Old Hundred Road, Midlothian, Virginia | Older, tri-level home in need of repairs and renovation. Well and septic system. |
| **Parcel No. 2:**<br>301$^{+/-}$ Acres Land and Improvements at 1132, 1222, 16407, 16408, 16410, 16301, and 16300 Old Hundred Road, Midlothian, Virginia | Public sewer and water available from adjacent Hallsley Subdivision. Required access from two or three points may be difficult without cooperating adjacent owners. |
| **Parcel No. 3:**<br>100$^{+/-}$ Acres Land and Improvements at 701, 731, 809, and 901 Old Hundred Road, Midlothian, Virginia | This property is well located and has public water along the entire frontage, but it has no public sewer at this time. Road improvements will be required on Old Hundred Road. |
| **Parcel No. 4:**<br>265$^{+/-}$ Acres Land and Improvements at 921 and 1201 Old Hundred Road, Midlothian, Virginia | This property is well located and has public water along the entire frontage but has no public sewer at this time. Road improvements will be required on Old Hundred Road. |
| **Parcel No. 5**:<br>114$^{+/-}$ Acres Land and Improvements at Parcel 1 of 1301 Otterdale Road, Midlothian, Virginia | Property will be adjacent to Roseland Town Center and Woolridge Road extended. At this time, however, it has no public sewer and water and has inadequate road infrastructure. |
| **Parcel No. 6:**<br>42$^{+/-}$ Acres Land and Improvements at Parcel 2 of 1301 Otterdale Road, Midlothian, Virginia | Property will be adjacent to Roseland Town Center and Woolridge Road extended. At this time, however, it has no public sewer and water and has inadequate road infrastructure. |
| **Parcel No. 7:**<br>87$^{+/-}$ Acres Land and Improvements at 2301 Old Hundred Road, Midlothian, Virginia | Property has no public water or sewer. Extensive road improvements will also be required. Needs cooperation of adjacent Smith property for appropriate road access and project massing. |
| **Parcel No. 8:**<br>16.6$^{+/-}$ Acres Land and Improvements at 2041 and 2131 Old Hundred Road, Midlothian, Virginia | Property has no public water or sewer. Extensive road improvements will also be required. Needs cooperation of adjacent Styles property for appropriate road access and project massing. |
| **Parcels No. 9 and 10:**<br>343.78 $^{+/-}$ Acres of vacant land, terminus of Woodlridge Road and Route 288, and Old Hundred Road, Midlothian, Virginia | Property is well located, and sewer is available for approximately half of the property. Water is adjacent to the south but lacks adequate pressure. Additional water and sewer infrastructure and road connections are required. |

C.    Events Leading To Chapter 11 Filing

    Chesterfield County approved the rezoning of Roseland as a Master Planned Community in August of 2008.  Immediately thereafter, the subprime mortgage issue in residential lending emerged as a major problem. Development, particularly of large-scale residential communities, came to an abrupt halt almost overnight. Lenders began to tighten the requirements related to development loans, and the lack of industry transactions squeezed the resources of developers like the Debtors.

    Most of the acquisition loans related to the assembled Roseland development were held by nine (9) different loans with five (5) different banks (some banks had more than one acquisition loan made to the Debtors). The loans with those banks typically were short-term loans of one to three years to maturity. In many cases, the loans were "rolled over" at maturity by

the lenders on new terms and conditions. In 2009 and thereafter, either some lenders did not renew the loans or the terms of the renewals were such that the Debtors could not meet the terms. A Roseland Village lender, whose loan was not renewed, commenced a foreclosure proceeding against most of the land owned by Roseland Village, causing it to file for bankruptcy protection on January 13, 2011. Thereafter the same lender, whose loan was also not renewed, commenced foreclosure proceeding on land owned by GBS, causing it to file for bankruptcy protection on June 3, 2011.

D.   Summary of Post-Petition Events

The Debtors initially determined that because of the zoning on the entire assemblage, it would be in the best interests of the creditors and the estate that they develop Roseland as they originally contemplated. The initial Plan of Reorganization that was filed contemplated development over a number of years.

The Bankruptcy Court directed that the secured creditors and the Debtors engage in mediation in an effort to determine if the parties could agree on a plan that was acceptable to most, if not all, of the parties. The mediation did not result in an agreement that was acceptable to all of the parties who participated in that mediation.

Thereafter, the Debtors continued to seek a solution that would be acceptable to some of the secured creditors. The Second Amended Plan of Reorganization is the Debtor's attempt to address many of the issues that the secured creditors had with the initial Plan of Reorganization. In short, the Debtors believe that in order to satisfy its creditors, it must seek a zoning modification of the entire assemblage so that each parcel has distinct zoning requirements and proffers attached to it that will enable the various parcels, after the zoning modification, to be isolated and sold, developed or, if necessary, returned to the secured creditor that has an interest in a parcel. The Debtors have sought the input of various Chesterfield County governmental officials to determine if the zoning modification as described herein would be feasible, and based on their input, the Debtors believe that it is not only feasible but will be favorably viewed by the County.

The Debtor has been in contact with large builders and others who have expressed interest in purchasing large tracts of land or making long-term commitments to purchase finished lots in Roseland when the zoning modification as described herein is completed.

In October, 2012, the County of Chesterfield approved its new Comprehensive Plan for development in Chesterfield County. Roseland is designated as a *Prime Economic Development Opportunity Site* in the Comprehensive Plan. That designation, the Debtors believe will enable it to successfully work with the County of Chesterfield to modify the existing zoning as discussed in more detail herein because the County recognizes the Roseland Village site as one that is an integral part of the growth the County wants to encourage.  Additionally, the development of Roseland provides the County an opportunity to complete a key piece of transportation and utility infrastructure that will enhance its ability to control and direct growth towards its primary growth corridor.

E.    Post-Filing Issues

Since Roseland Village's is a single-asset case, it was required to either commence payments to its creditors or file a plan within 90 days of the date on which it filed its petition, or a petitioning creditor could seek, and would be granted, relief from stay to foreclose on the property that secured its loan.  The Bankruptcy Code allows the Bankruptcy Court to extend that deadline. Roseland Village filed a motion to extend that deadline, and the Bankruptcy Court entered an order on April 7, 2011 extending the time in which Roseland Village could file a Plan to and including October 11, 2011. The Debtor timely filed a Plan, meeting the imposed deadline.

There have been no significant post-filing proceedings or issues in the GBS bankruptcy case, except some secured creditors have filed Motions for Relief from Stay, which are all still pending.

F.    Summary of the Plan of Reorganization

As stated above, the original intent of the zoning approval for Roseland Village was that a single developer would develop the entire assemblage. Thus, the existing zoning requires that all roads and infrastructure rights of way (sewer and water) to be dedicated before approval of the development plan for any portion of the land can be approved by the County.  It also requires that an overall phasing plan be approved for the entire development, and specific land use requirements such as allowable densities, infrastructure construction and other elements of the overall land plan be coordinated over the entire acreage of the development.  The zoning provides for the consideration and ultimately approval by the Board of Supervisors for a project-wide infrastructure financing plan, and in lieu of that plan payment of the maximum cash proffer for every residential unit constructed in the project.  If an overall financing plan is not approved with the consent of all parcels in the project, the maximum cash proffer payment makes many of the residential units proposed in the project not economically feasible to develop or sell. Through an application to  modify the zoning conditions of the development, the Debtor will seek to finalize this overall financing plan, clarify project-wide requirements for infrastructure and land planning, and identify specific requirements for each respective parcel in the assemblage to allow for the construction of smaller developments within the overall master plan that are not bound by the performance or obligations of other portions of the project. It is important to note that the Debtor does not seek to modify the approved uses for Roseland Village or any of its parcels that comprise the Roseland Village assemblage.

The current uses allowed by the Master Planned Community are as follows:

    a.    1.5 million square feet of commercial space;
    b.    3,111 single-family residences;
    c.    2,543 multifamily residences (apartments, townhomes or condos);
    d.    769,382 square feet of office space;
    e.    Up to two (2), 600-student elementary schools;
    f.    Up to a 480-room hotel/motel; and
    g.    Up to 20,000 square feet for a community recreation center

The Debtors will immediately seek the modification of existing proffers that are required by the Roseland Village approved zoning. It is absolutely imperative that the entire Roseland assemblage be subject to the zoning modification process. The Debtors do not believe, therefore, that the modification to the existing zoning could be approved for only a portion of the assemblage or that parcels could be "carved out" and removed from that process. Accordingly, the Plan contemplates that all of the assemblage will be subject to that zoning modification application. That application will request the County of Chesterfield approve the development alternatives that were approved in the original Master Plan Development, but with the following changes:

1.        Modification of Zoning Conditions and Proffers: The current zoning approvals consider project-wide infrastructure financing strategies for the project, to be approved by the Board of Supervisors to provide financing for public schools facilities, roads, parks and other public facilities.  At the time of zoning one of the methods being considered for overall infrastructure financing was a Community Development Authority (CDA), which created a special tax district for the development which raised money to pay for a large portion of the community-wide infrastructure.  As a default mechanism, the zoning also provides for the payment of the maximum cash proffer prior to the construction of any type of residential unit in the project.  Currently these proffers are in excess of Nineteen Thousand Dollars ($19,000.00) per developed unit (e.g. house, condominium, townhouse, etc.).   The Debtors believe that the high cash proffers are an impediment to the development of the property and that the County agrees that the cash proffers should be re-evaluated. The debtors believe an infrastructure financing plan for the entire project to be considered during zoning condition modification benefits all creditors because the overall infrastructure scope and cost can be finally agreed on and quantified, and a plan to pay for the infrastructure can be approved by the Board.  In lieu of payment of cash proffers, the Debtor believes Development District, or Special Assessment District, as described in the 2012 Chesterfield County Comprehensive Plan, is the best method of financing community-wide infrastructure and can be negotiated and agreed upon during the zoning modification process.  The Debtors have had discussions with Chesterfield County officials about these proposals, and the Debtors believe that these requests will be favorably received.

2.        Modification of Infrastructure Requirements: A Transportation Plan will need to be approved that allows the construction of roads and utilities on a parcel by parcel basis without requiring all of them to be constructed at the same time. The Transportation Plan will also identify the specific location of all primary road rights of way that must be dedicated prior to the commencement of construction on any parcel included in the overall Roseland zoning and master plan.  These road rights of way are located on property secured by each and every creditor.  The Debtor will seek approval of an "Assessment District" that is permitted by Chesterfield County. These districts involve the roads and infrastructure to be built in concert by landowners, developers and by the County, using a combination of public and private resources. In the case of a utility district, for example, the County may install a primary sewer or waterline extension.  The cost of that construction will be assessed and paid when a parcel so improved is developed by the owner. This modification would immediately add value to each parcel in the assemblage because roads and infrastructure would be constructed before the developer of a parcel determined the use it proposes for that parcel. These districts are important for

municipalities because they help to direct growth, and enable economic development in areas that are desirable for such use but for the lack of availability of public utilities.

As stated above, the current uses allowed under the existing zoning approvals will not be the subject of the zoning modification requests. The current allowed uses are as follows:

 a.  1.5 million square feet of commercial space;
 b.  3,111 single-family residences ;
 c.  2,543 multifamily residences (apartments, townhomes or condos);
 d.  769,382 square feet of office space;
 e.  Up to two (2), 600-student elementary schools;
 f.  Up to a 480-room hotel/motel; and
 g.  Up to 20,000 square feet for a community recreation center.

The Debtors believe that it will take no more than 365 days to complete the zoning modification process and obtain the final approvals precedent to the ability to begin construction and development in the project (herein referred to as "the Zoning Modification Phase"). While the Debtors will seek to either sell or develop plans for all of portions of the assemblage during the Zoning Modification Phase, they believe that the value in each parcel will be maximized at the conclusion of the Zoning Modification Phase.  After the zoning modifications and County approvals are complete, each potential purchaser will be able to ascertain the exact extent of the "proffers" and conditions that are imposed on each parcel. In other words, a potential purchaser will be able to accurately calculate what infrastructure requirements are imposed on a parcel, as well as other proffers and conditions.

The Debtors propose that they be given 365 days after the final approval of the rezoning (herein referred to as "The Marketing Phase") to market the entire assemblage or each parcel in order to obtain the highest and best price that the market will bear.  If the Debtors cannot procure an offer that is acceptable to the secured creditor that has a lien on a parcel during the Marketing Phase, then the Debtors will convey to that creditor, or its assigns, title to its collateral.

The Debtors believe that they can procure sales during the Zoning Modification Phase and the Marketing Phase that will be acceptable to each secured creditor with a lien on a parcel and also believe that they can sell most, if not all, of the parcels in excess of the amounts owed to each secured creditor.

The Debtors, their officers and directors maintain the right to be participants, members, or equity owners in any entity that purchases any of the parcels as contemplated by the Plan.

## III. <u>FINANCIAL INFORMATION</u>

A.      <u>Creditors' Claims</u>

<u>Roseland Village's Creditors</u>

As of October 10, 2011, certain creditors had filed proofs of claim in the case or were listed by Roseland Village as undisputed obligations. Based upon a review of the proofs of claim, Roseland Village believes that the following accurately describes the claims in its case:

1.      Priority Claims and Administrative Expenses. Other than real estate taxes (which are secured claims) and professional fees, Roseland Village does not believe it has any unpaid post-petition obligations. The amounts are estimated to be $75,000.00 or less.

2.      Unsecured Claims without priority in the total amount of approximately $490,107.61. Included in this amount is $422,987.00 owed to insiders.

3.      Secured Claims in the approximate amount of $20,782,634.00, plus interest and fees that have accrued post-petition.

<u>GBS' Creditors</u>

As of October 10, 2011, certain creditors had filed proofs of claim in the case or were listed by GBS as undisputed obligations. GBS believes, based upon a review of the proofs of claim, that the following accurately describes the claims against it:

1.      Priority Claims and Administrative Expenses. Other than professional fees, and real estate taxes that accrued post-petition (which are secured by the real estate), GBS does not believe it has any unpaid post-petition obligations. The amounts are estimated to be $75,000.00 or less.

2.      Unsecured Claims without priority in the total amount of approximately $1,243,068.37. Included in this amount is $1,122,660.11 owed to insiders.

3.      Secured Claim in the approximate amount of $23,079,101.56.

B.      <u>Executory Contracts and Unexpired Leases</u>

Roseland Village is not a party to any leases or executory contracts.

GBS has a lease with Mark Richards, who occupies a residence located on land owned by GBS at 807 Old Hundred Road, Midlothian, Virginia  23114. The terms of the lease are as follows:  rental of the property in exchange for caretaker duties for 807 Old Hundred Road and 701 Old Hundred Road. GBS will assume this lease on the Effective Date.

GBS has a lease with James Huebler, who occupies a residence located on land owned by GBS at 1301 Otterdale Road, Midlothian, Virginia  23114.  The terms of the lease are as follows: Rental of the property through January, 2014 for the sum of $1,000.00 per month.  GBS will assume this lease on the Effective Date.

GBS is not aware of any other leases or executory contracts to which it is a party.

C.      Unpaid Debt Incurred since the Commencement of the Case

The Debtors have not incurred any material or significant unsecured debt post-petition, except for accrued salaries to members of the Sowers Family and ordinary-course unsecured debt for operating expenses to affiliates of GBS known as Riverton Associates, LLC and George B. Sowers, Jr. and Associates, Inc.

In addition, there are post-petition sums, including post-petition interest that has accrued and is owed to secured creditors, including the banks and other lenders and to the County of Chesterfield for post-petition taxes (which is secured under applicable non-bankruptcy law).

Finally, the Debtors will owe their professionals for fees incurred post-petition, which are estimated to be $150,000.00 or less.

D.      Distribution on Unsecured Claims

No distributions have been made post-petition to holders of Unsecured Claims of either Roseland Village or GBS by either of them.

E.      Liquidation Analysis

In order to make an informed decision as to whether to accept or reject the Plan, unsecured creditors may compare the return on their pre-petition claims under the Plan to the probable return if this case were to be converted to a case under Chapter 7 of the Bankruptcy Code.  Under Chapter 7, a disinterested Chapter 7 trustee is appointed by the Bankruptcy Court to liquidate a debtor's assets and to distribute those assets in accordance with priorities established by the Bankruptcy Code. Under the Bankruptcy Code, payments of administrative claims (including the trustee's fee, trustee's counsel's fee, costs of maintaining and liquidating the assets of the estate and taxes) are entitled to first priority.  Secured creditors receive either the property on which they have liens or the proceeds from the sale of such property. Unsecured creditors are entitled to payment only after payment of administrative expenses and any payments to secured creditors.

If this case were to be converted to a case under Chapter 7, a Chapter 7 trustee would be appointed to administer the case, and the Chapter 7 trustee, in all likelihood, would appoint an attorney to represent him or her in the case. The Chapter 7 trustee would be entitled to a commission based on the total amount of funds in the estate. In contrast, under the Plan, there is no trustee's commission to be paid in this Chapter 11 case.  In addition, the Chapter 7 trustee's attorney would be required to become familiar with the case. This presupposes that a Chapter 7

estate would have any assets available to fund either administrative expenses or distributions to unsecured creditors after the satisfaction of secured creditors.

The Debtors believe that if the Property owned by each of them were to be auctioned or sold in the current market, the proceeds from those sales would reflect a substantial devaluation of the project and the respective parcels. This is due to a host of factors, including current market conditions, lack of conventional credit and financing, uncertainty of entitlements, and lack of final planning requirements. Thus, the proceeds would not be sufficient to pay off the liens held by secured creditors or to pay all of the other expenses and unsecured claims.

A liquidation analysis under Chapter 7 for both Debtors is based on the Debtors' knowledge of the value of undeveloped parcels that have not been rezoned or approved for development but have been liquidated through sales that were not at arm's length. The Fair Market values in the following table are based on either (a) the value set forth in the Secured Creditor's Proof of Claim, which the Debtor accepts for the purpose of this Disclosure Statement; or (b) appraisals of the parcel that the Debtor believes accurately reflects the true market value of the parcel (even if there is a more current appraisal that the Debtor discounts).

### LIQUIDATION ANALYSIS TABLE

| Parcel Number[3] | Owner | Acreage | Fair Market Value | Source of Fair Market Value | Liquidation Value Estimate[4] | Secured Party |
|---|---|---|---|---|---|---|
| 1 | GBS Holding | 2.50 ± | $450,000 | Pre-Petition Appraisal | $175,000 | Bank of Powhatan (Essex Bank) |
| 2 | GBS Holding | 301 ± | $12,220,000 | Proof of Claim No. 4 | $2,750,000 | Franklin Federal |
| 3 | GBS Holding | 100 ± | $4,600,000 | VCB's Post-Petition Appraisal | $1,500,000 | Va. Comm. Bank 4K Assoc. Second Deed of Trust |
| 4 | GBS Holding | 265 ± | $10,600,000 | CVB's Post - Petition Appraisal and recent appraisal of adjoining land by VCB | $3,500,000 | Central Va. Bank |
| 5 | GBS Holding | 114 ± | $11,400,000 | Pre-Petition Appraisal and adjoining land at $100,000/acre | $1,750,000 | Bank of Powhatan (Essex Bank) |
| 6 | GBS Holding | 42 ± | $4,000,000 | Proof of Claim No. 13 | $630,000 | Paragon Bank |

---

[3] The Parcel Number listed below is the same number used on <u>Schedule I</u> attached hereto, depicting the entire Roseland assemblage with the original boundary lines.

[4] The Debtors' estimated liquidation value is based on each parcel's being sold at auction at different times. If each of the assembled parcels were to be sold separately, then the Master Planned Development approval by Chesterfield County would be withdrawn, and the land would be worth a fraction of the amount of the Fair Market Value and the Liquidation Value.

| 7 | GBS Holding | 87 ± $1,364,300 | | Proof of Claim No. 3 | $550,000 | Walter P. Styles |
| 8 | GBS Holding | 16.63 | $1,000,000 | Proof of Claim No. 14 | $225,000 | Donese B. Smith |
| **Totals** | | | **$45,634,300** | | **$11,080,000** | |
| 9 | Roseland Village | 313.50 | $37,500,000 | Proof of Claim No. 4 filed on 04/04/11 | $12,000,000 (combined) | Franklin Federal |
| 10 | Roseland Village | 30 | $5,500,000 | Proof of Claim No. 6 | | BB Hunt |
| **Totals** | | | **$43,000,000** | | **$12,000,000** | |

A summary of the claims against each Debtor based on Proofs of Claims and the schedules is as follows:

## ROSELAND VILLAGE ESTIMATED CLAIMS

| | Proof of Claim/Scheduled | Estimate of Interest, fees real estate taxes and costs accruing before end of Marketing Period* | Estimate of Total Due at end of Marketing Period | Insider Portion of All Claims |
|---|---|---|---|---|
| Priority/Administrative | Est. $50,000.00 | | $50,000.00 | N/A |
| Secured Claims | $20,782,634.00 | $5,156,526.00 | $25,939,160.00 | N/A |
| Unsecured Claims | $490,107.61 | | $490,107.61 | $422,987.00 |
| **Total Claims** | | | **$26,479,267.61** | |

*This amount was calculated by adding 5% per annum from April 2011 to April 2015 to the basic proof of claim balances, plus adding $1,000,000.00 to cover real estate taxes and attorney fees and other costs that the secured creditors may add to the amount owed to them collectively.

## GBS HOLDING ESTIMATED CLAIMS

| | Proof of Claim/Scheduled | Estimate of Interest, fees and costs accruing before end of Marketing Period | Estimate of Interest, fees, real estate taxes and costs accruing before end of Marketing Period* | Estimate of Total Due at end of Marketing Period | Insider Portion of All Claims |
|---|---|---|---|---|---|
| Priority/Administrative | Est. $50,000.00 | n/a | | $50,000.00 | N/A |
| Secured Claims | $23,079,101.56 | | $5,615,820.00 | $28,694,921.56 | N/A |
| Unsecured Claims | $233,445.13 | | | $233,445.13 | $1,122,660.11 |
| **Total Claims** | | | | **$28,978,366.69** | |

*This amount was calculated by adding 5% per annum from April 2011 to April 2015 to the basic proof of claim balances, plus adding $1,000,000.00 to cover real estate taxes and attorney fees and other costs that the secured creditors may add to the amount owed to them collectively.

Based on the Debtors' calculations, if Roseland is marketed and sold as they plan, there are sufficient assets to pay all of their creditors 100% of the obligations owed to them. Accordingly, the Debtors believe that all creditors will recover all that is owed to them if the Plan is accepted and completed.

## IV. PLAN FEASIBILITY.

The Court cannot confirm a Plan if it is not feasible.  A Plan is feasible if the Plan proponent can perform its obligations under the Plan and if confirmation will not likely be followed by either the liquidation of or the need for further financial reorganization of the Debtor.

The Debtors did not propose this Plan without extensive discussions with its creditors, Chesterfield County Officials and potential purchasers of large tracts of land. It has become abundantly clear to the Debtors that the development of the entire assemblage into lots and finished parcels would take too long for the secured creditors. Furthermore, unless one developer were to buy the entire assemblage, which the Debtors believe will not occur, each parcel is worth significantly less to a potential buyer, because that buyer would be required to seek rezoning for that parcel. The conditions included in the existing zoning provides for an unprecedented range of housing types and commercial development, which will allow the development to move forward in multiple phases to serve a wide range of markets.  The existing zoning does however require the participation of all parcels and landowners to move forward.  If the project were broken up prior to modification of the existing zoning conditions, then it is entirely possible one or more holdouts could prevent the entire project from moving forward in any capacity.

The Debtors are experienced in the acquisition and zoning of land in Chesterfield County. That expertise and experience will cause the Zoning Modification Phase to proceed more expeditiously and with a greater potential for success. The Debtors will engage McGuire Woods as legal counsel and Timmons Group and engineering counsel to assist them in the Zoning Modification Phase.  Both these entities have assisted the Debtor on the prior zoning case involving Roseland Village and have the knowledge and expertise to assist the Debtor in implementing the Plan.

Since the Debtors are only proposing a limited Marketing Phase after the Zoning Modification Phase is completed, the creditors will either obtain a payoff of their liens or title to the property that serves as their collateral, either by deed, foreclosure or otherwise, within a definite period of time. Accordingly, the Debtors believe that this plan is feasible.

<u>Funding Required During the Zoning Modification Phase and Marketing Phase.</u>

The Debtor had proposed Debtor-in-Possession (DIP) financing to cover the costs that would be incurred in the Zoning Modification Phase and other administrative expenses that would have to be paid in this case. The DIP financing would have involved a priming of the

secured creditors' liens on the property. That proposal was resisted unilaterally by the secured creditors.  Accordingly, the Debtor has proposed that the harvesting, or "Select Cut" timbering described herein, which is typical in the normal management or large tracts of property, be the source of revenue for the expenses to be incurred during the Zoning Modification Phase as well as most of the administrative and priority expenses incurred in this case.

The Debtors have attached Schedule II to this Disclosure Statement, which represents the Debtors' best estimate of the fees, costs and expenses that the Debtors will incur during the Zoning Modification Phase and the Marketing Phase. The payments for engineering and attorneys to assist the Debtors during this phase are detailed on this schedule. The expenses consist primarily of engineering studies, plans and diagrams, fees to zoning attorneys assisting in the rezoning process and fees required by the County and other state and local agencies that have to approve the rezoning application. The Debtors and their employees will not charge the estate any amounts associated with their services rendered during the Zoning Modification Phase and the Marketing Phase, except for reasonable and necessary out-of -pocket expenses.

The Income required to pay these expenses will come from timber management of the land, conducted under the best silviculture practices as recommended by the Virginia Department of Forestry and as approved by the Chesterfield County Department of Environmental Engineering for residential timber thinning.

<u>Details of Selective Timbering To Be Performed</u>

The Debtors expect to selectively harvest mature or over-mature trees that would be removed during the normal course of development. The trees that will remain are expected to be those trees that can best grow with the development on the lots. The Debtors have obtained a report from Timber Marketing & Management, Inc., dated July 12, 2011 and October 14, 2011 (herein referred to as "the Timber Report"). The Timber Report is posted on the Debtors' secure website and has been made available to all of the Debtors' secured creditors. That report lists the select timbering, buffer zones, methods of timbering, etc. that the Chesterfield County Department of Environmental Engineering approved on November 3, 2011. A copy of that approval is also on the secure website and has been made available to all secured creditors. Attached as Schedule III is a map that shows the timber areas and "districts" referred to in the report.  The Debtors anticipate that Timber Marketing & Management, Inc. will recommend a qualified timber harvester (forester) that the Debtors will engage to harvest the selected timber in accordance with the Timber Report and Timber Marketing & Management, Inc. designation of the timber to be harvested. Payment will be tendered to the Debtors for the timber to be harvested before the harvest commences. The Debtors expect to receive the payment within sixty (60) days of the Effective Date.

The estimated value of the timber to be harvested is between $575,000.00 and $655,000.00 ("Timber Proceeds"). The Debtor believes this amount is not material when compared to the $77,245,700.00 the property, as a whole, is worth and that the total debt is approximately $55,459,000.00.

The Debtor estimates, based on its discussions with Timber Marketing & Management, Inc., that the dollar value of the timber that will be removed from various parcels is as follows:

| Parcel Name | Creditor(s) | Acreage | | Valuation | | | |
|---|---|---|---|---|---|---|---|
| | | Total | Harvestable | Low | High | Avg. | $/Acre Avg. |
| Roseland Village | FFSB | 343.00 | 202.00 | $170,000 | $195,000 | $182,500 | $903.47 |
| Cole/RCS | Essex/Paragon/Smith/Styles | 288.00 | 177.00 | $144,000 | $155,000 | $149,500 | $844.63 |
| West Park | CVB/VCB/Essex | 367.00 | 194.00 | $155,000 | $176,000 | $165,500 | $853.09 |
| North Hallsley | FFSB | 304.00 | 160.00 | $102,000 | $130,000 | $116,000 | $725.00 |
| Total: | | 1,302.00 | 733.00 | $571,000 | $656,000 | $613,500 | $836.97 |

Based on the foregoing table, the Debtor projects that the value of the timber that will be selectively removed from each parcel is as follows:

**DEBTOR'S ESTIMATE OF TIMBER
SELECTIVELY REMOVED FROM EACH PARCEL[5]**

| Parcel Number | Owner | Acreage | Secured Party | Estimated Value of Timber |
|---|---|---|---|---|
| 1 | GBS Holding | 2.50+/- | Bank of Powhatan (Essex Bank) | $1,127.38 |
| 2 | GBS Holding | 301+/- | Franklin Federal | $114,855.26 |
| 3 | GBS Holding | 100+/- | Va. Comm. Bank 4K Assoc. Second Deed of Trust | $27,057.22 |
| 4 | GBS Holding | 265+/- | Central Va. Bank | $115,353.54 |
| 5 | GBS Holding | 114+/- | Bank of Powhatan (Essex Bank) | $59,177.08 |
| 6 | GBS Holding | 42+/- | Paragon Bank | $21,802.08 |
| 7 | GBS Holding | 87+/- | Walter P. Styles | $45,161.94 |
| 8 | GBS Holding | 16.63 | Donese B. Smith | $8,632.59 |
| 9 | Roseland Village | 313.50 | Franklin Federal | $166,803.94 |
| 10 | Roseland Village | 30 | BB Hunt | $15,962.10 |
| Total | | | | $615,932.66 |

# V. PROJECTED PAYMENTS TO CREDITORS DURING THE PHASES

During the Zoning Modification Phase and the Marketing Phase, neither Roseland Village nor GBS proposes to make any payments to its creditors who had claims pre-petition. The Debtors believe that the equity that exists in each parcel serves as adequate protection of each creditor's lien and position during the Phases outlined herein.

---

[5]   The Debtor's estimate is based on the average per-acre timber count in the report of Timber Marketing & Management, Inc., dated July 12, 2011 and October 14, 2011, along with the Debtor's knowledge of the open spaces and topography of each parcel.

## VI. <u>SECURED CREDITORS' OBLIGATIONS</u>

In order for this Plan to be successful, the secured creditors must agree to a number of reasonable terms. Those terms are as follows (herein referred to as the "Secured Creditors' Obligations"):

1.      Execute whatever documents that are reasonably and necessarily required by various governmental agencies in order to file, process or obtain approval to the Rezoning Plan;

2.      Execute whatever documents that are reasonably and necessarily required in order to selectively timber the parcels that serve as their collateral as outlined herein;

3.      Upon the final approval from Chesterfield County on the zoning modification request as outlined herein, release all guarantors on the obligations that are secured by real property owned by the Debtors; and

4.      Execute whatever documents that are reasonably and necessarily required to dedicate easements, rights of way or other access for roads, infrastructure, utilities, etc. that cross through the real property that serves as the collateral for the loans. There will be no release fees or other payments made to the secured creditors in exchange for the agreements required by this paragraph.

## VII. <u>DISCLOSURE OF COMPENSATION</u><br><u>TO INSIDERS DURING PLAN IMPLEMENTATION</u>

The principals and/or insiders of both Debtors are George B. Sowers, Jr., George B. Sowers, III ("Casey Sowers") and Christian Sowers. Neither the Debtors nor the principals or insiders will receive salary or   wages from the Debtors during the Zoning Modification Phase or the Marketing Phase. Any claim for wages by the insiders during the Bankruptcy Case shall cease to accrue upon the Effective Date.

The Debtors and their principals expect to  receive remuneration for all of their efforts during the Marketing Phase of the implementation plan if they are successful in selling any parcel for more than a secured creditor is owed or agrees to take in satisfaction of its lien on that parcel and if all of the unsecured creditors receive one hundred percent (100%) of their allowed claims. In other words, the insiders will only receive payment for their efforts if they are successful in satisfying all of the payments due under the Plan.   Notwithstanding the foregoing, the insiders  shall not be prohibited from becoming equity interest holders in any entity that purchases any parcel of land that is owned by the Debtors.

## VIII. <u>THE MARKETING PHASE</u>

The Debtors intend to market the property primarily in three ways.  First, the Debtors have an extensive number of contacts in the development and homebuilding community that it will solicit during the course of the Zoning Modification process and when the Zoning

Modification Phase is final. Those contacts include national, regional and local home builders, as well as local and regional developers.  Many of the potential customers continue to express interest in participating in the project.  Most have explained that clarification of the proffers and zoning conditions are necessary for their consideration of participating in the development.  By creating modestly sized development parcels, or "pods", the Debtor can market parcels of a size, density and distinctive market strategy and niche such that one developer can successfully market an individual and distinctive portion of the project concurrent with other development activity in the project.  Second, the Debtors intend to work with Chesterfield County by utilizing Public / Private partnership opportunities provided by the State to construct major school, park and other public infrastructure within the project.  The debtor has twice previously negotiated significant transactions with Chesterfield County, including the sale and construction of James River Landing Park and the current sites for James River High School and Bettie Weaver Elementary School, as well as the expansion of the Eppington Plantation Park.  Finally, the debtors may market specific portions of the project, such as multi-family segments or commercial segments, through one or more of the following real estate brokerages:  (a) Commonwealth Commercial Partners and/or (b)  CB Richard Ellis and/or (c)  Thalhimer Cushman Wakefield and/or (d) NAI Eagle.

## IX. <u>SUMMARY OF THE PLAN</u>

The following is a brief summary of the Plan and should not be relied upon for voting purposes. Creditors are urged to read the entire Plan and to consult with an attorney or with each other in order to fully understand the Plan.  If confirmed, the Plan would represent a legally binding agreement by the Debtor in each case, with each of its creditors, and an informed decision concerning the approval of the Plan cannot be made without understanding it.

Administrative Expense Claims and the Priority Claims will be paid by the Debtors under the Plan (a)  from the proceeds from the selective timbering described herein; (b) within 120 days of on either the Effective Date or the dates on which payments of such claims become due in accordance with terms; or (c)  approved amounts owed to Professionals will be paid in accordance with an agreement made with them for such payment, as approved by the Bankruptcy Court.

<u>Allowed Priority Claims in Both Cases</u>

Priority Claims in both cases are, to the extent allowed, Unsecured Claims entitled to priority pursuant to 11 U.S.C. § 507(a)(1)-(8), including (but not limited to) United States Trustee's Fees pursuant to 28 U.S.C. § 1930(a)(6).  The Internal Revenue Service ("IRS") has a filed a Proof of Claim (Amended Proof of Claim No. 9) in the GBS Holding case in the amount of $100.00. GBS intends to object to the IRS claim. If that objection is overruled, or if the IRS is, in fact, allowed a priority claim of $100.00, then it will be paid in full on the Effective Date. The Debtors believe that the only allowed Priority Claim will be the fees owed to the Trustee.

<u>Roseland Village's Creditors</u>

The creditors of Roseland Village will be treated as follows:

**Class 1:  Franklin Federal Savings and Loan:**  Class 1 consists of the Secured Claims of Franklin Federal Savings and Loan ("Franklin Federal") that are included in Proof of Claim No. 4.  Franklin Federal has a first deed of trust on approximately 313.30 acres. The Debtor believes that it owes Franklin Federal, as of April 4, 2011, approximately $14,947,614.12, plus interest and fees (according to the Proof of Claim) and that the fair market value of the land that is subject to Franklin Federal's lien is, in the opinion of the Debtor, $37,450,000.00. This figure was arrived at by using earlier appraisals that were commissioned by the Bank that the Debtor believes more accurately reflect the fair market value of the land. Accordingly, Franklin Federal is over-secured.

Franklin Federal will be paid as follows: Immediately upon the Effective Date, Roseland Village shall convey to Franklin Federal or its assignee 80 +/- acres, which is the "commercial site" on their parcel, from the land that serves as its collateral. That site is marked and delineated on Schedule I attached hereto (herein referred to as "The Land Conveyed to FFSB"). Franklin Federal agrees that the principal balance of $14,947,614.12, plus interest from April 4, 2011, will be reduced to $5,000,000 after crediting the value of the Land Conveyed to FFSB against the balance due.  The Land Conveyed to FFSB is a high-value parcel zoned specifically for commercial uses, and is included in the Chesterfield County Comprehensive Plan as a prime economic development site.  The debtors believe the property may be marketed and sold for a price higher than the value at which it is conveyed to FFSB.

The Debtor shall have 365 days from the final approval of the Zoning Modification Plan to pay Franklin Federal in full the remaining balance owed to Franklin Federal under terms and conditions acceptable to Franklin Federal. If the Debtor fails to do so, then Franklin Federal shall have the option to either (a) foreclose on the land that serves as its collateral or (b) elect to take a Deed in Lieu of Foreclosure. If Franklin Federal elects to take a Deed in Lieu of foreclosure, then the Debtor shall tender a deed within twenty-four (24) hours of that request.

Franklin Federal agrees that the Debtor, or its assigns, shall have: (a) the option to purchase the Land Conveyed to FFSB at any time before Franklin Federal receives a *bona fide* contract to purchase from an unrelated third-party purchaser, for the sum of $12,000,000; and (b) the right of first refusal to purchase the Land Conveyed to FFSB for the purchase price and under the terms and conditions contained in a *bona fide* offer to purchase made by a disinterested potential purchaser. The Debtor shall have 10 days to notify Franklin Federal that it will exercise its options. The terms and conditions of the sale shall be identical to those contained in the offer to purchase.

Franklin Federal also shall abide by the obligations set forth in Section VI above with respect to the land that the Debtor continues to own that is subject to the Franklin Federal lien and for The Land Conveyed to FFSB.

The obligations owed to this creditor shall remain secured by the existing deed of trust, and that obligation shall continue to accrue interest from the Petition Date until the land is conveyed by sale, deed in lieu of foreclosure or foreclosure at the rate of five percent (5%) per annum. This creditor shall be entitled to reasonable costs and attorney's fees incurred related to this case and the Debtor's default. All real estate taxes paid by Franklin Federal, if any, shall be added to the balance due this creditor under the Deed of Trust Note it holds.

**Class 2:  BB Hunt, LLC:**  Class 2 consists of the Secured Claims of BB Hunt, LLC ("Hunt"), including those specified in Proof of Claim No. 6.  Hunt has a security interest in 30 acres of land owned by Roseland Village ("the Hunt land").

Upon confirmation, Hunt shall be entitled to notify the Debtor that it elects either Option A or Option B listed below as complete satisfaction of all amounts owed to it by the Debtor:

1.      Option A:      Hunt may work with the Debtor and Franklin Federal Savings Bank to move forward with a development plan whereby Hunt or HHHunt Homes would purchase finished home building lots at a discount from their retail value, as contemplated in the original agreement between the Debtor and Hunt.  The value of the discounted lots as a portion of the total purchase agreement would be equal to the amount of the Class 2 Claim.

2.      Option B:      Hunt may elect to have its secured claim be treated as follows: The Debtor will seek to modify the zoning conditions on the land as described herein. Upon receiving final approval of the modifications to the existing zoning, the Debtor shall have 365 days to market and sell ("the Marketing Phase") the Hunt land and pay off the obligation to Hunt or, in lieu of payment, convey to Hunt finished, developed lots in Roseland under terms and conditions that are acceptable to Hunt. If the parties cannot reach an agreement as to the satisfaction of the Hunt obligation at the end of the Marketing Phase or the Debtor has not paid the Hunt obligation in full, then Hunt shall be entitled foreclose on the Hunt land or demand that the Debtor tender to it a deed in lieu of foreclosure to the Hunt land.

The terms and conditions in Section VI above shall also apply to the Hunt obligation until the land is sold or conveyed to Hunt. Hunt's lien shall remain in place until one of the events described herein shall occur.

The obligations owed to this creditor shall remain secured by the existing deed of trust, and that obligation shall continue to accrue interest from the Petition Date until the land is conveyed by sale, deed in lieu of foreclosure or foreclosure at the rate of five percent (5%) per annum. This creditor shall be entitled to reasonable costs and attorney's fees incurred related to this case and the Debtor's default. All real estate taxes paid by Hunt, if any, shall be added to the balance due this creditor under the Deed of Trust Note it holds.

**Class 3:  Secured Real Estate Taxes Owed to Chesterfield County**:  Class 3 consists of the Secured Claims of County of Chesterfield, which are real property taxes imposed on real estate owned by Roseland Village. *See* Proof of Claim No. 5 for $337,303.56 filed by the County of Chesterfield on May 9, 2011. Additional real estate taxes have accrued post-petition that have

not been paid. The amounts owed to Chesterfield County for real estate taxes are secured under applicable non-bankruptcy law.

The Class 3 Claimant shall receive all of the taxes owed on each parcel when that parcel is sold by the Debtors or the secured creditors under a foreclosure action. Until the property is sold, the Class 3 Claimant shall maintain its lien on the property as set forth in applicable non-bankruptcy law.

The Class 3 Claimant is impaired.

**Class 4:   Roseland Village's Unsecured Creditors, Excluding Insider Claims:**  Class 4 consists of all allowed Unsecured Claimants of Roseland Village, excluding the claims of Insiders. The Debtor estimates the total amount of the claims that are in this Class to be Sixty-Eight Thousand Dollars ($68,000.00) or less.

The Class 4 claims are impaired.

The amount that the unsecured creditors in this Class will receive is dependent on whether or not the Debtor is successful during the Marketing Phase, as described herein, in selling one or more parcels for more than what is owed to the secured creditor with a lien on that parcel.  If the Debtor is completely unsuccessful in selling any of the parcels for more than what is owed on each parcel, then the creditors in this Class would not receive any dividend from the sale of the Debtor's real estate holdings.  Notwithstanding that fact, the Debtor will escrow the sum of $6,800.00 from the funds it receives from the timbering of the property owned by Roseland Village.  This amount represents approximately 10% of the total amount of claims held by the creditors in this Class.  This amount will be disbursed to the creditors on or before the second anniversary of the Effective Date.  This is the minimum amount that the creditors in this Class shall receive.  If the Debtor is able to sell any parcels for more than what is owed to the secured creditor with a lien on each parcel, then the Debtor shall make distributions on a *pro rata* basis to the holders of claims in this Class until such time as they are paid either all of those funds or 100% of the amount of their claim.  The escrow account shall be established in a special account, within thirty-six hours after the Debtor receives the funds from the selective timbering, at Essex Bank. The name of the disbursing agent for this account shall be Robert W. Hansen, CPA. Any interest generated by this special account shall belong to the Debtor.

**Class 5:   Roseland Village's Unsecured Insider Claims:**  Class 5 consists of all allowed Unsecured Insider Claimants of Roseland Village. The Debtor estimates the amount owed to insiders in this Class to be approximately $423,000.00.

The Class 5 claims are impaired.

The Class 5 claimholders shall not receive any distribution unless the holders of all claims in Class 4 have received 100% of their allowed claims.  If the creditors in Class 4 receive 100% of their allowed claims, then the holders of Class 5 claims shall be entitled to receive a *pro rata* distribution, not to exceed 100% of their claims, from amounts generated by the Debtor from the sale of its property above the amounts due to the secured creditors with liens on those

parcels.  Distribution to the holders of this class will only occur after all of the claims of Class 4 are paid in full.

**Class 6:  Equity Holders in Roseland Village:**  Class 6 consists of the holders of the equity interests in the Debtor. The two equity holders in Roseland Village are GBS Holding and Theresa Sallé.

The Class 6 Equity holders shall only receive amounts, if any, that remain after all of the land is sold or returned to the secured creditor that has a lien on the land and all Class 4 and Class 5 claimants are paid in full.

<u>GBS Holding, Ltd.'s Creditors</u>

The creditors of GBS Holding, Ltd. will be treated as follows:

**Class 7:  Essex Bank (formerly Bank of Powhatan):**  Class 7 consists of the Secured Claims of Essex Bank, formerly known as the Bank of Powhatan. The two claims of Essex Bank are as follows: (1) $225,000.00, plus interest and attorney fees set forth in a Confession of Judgment in the amount of $32,187.42 received on February 10, 2011 in Chesterfield County Circuit Court in Order Book No. 0300, Page 0927, which is set forth in Proof of Claim No. 8 (Referred to herein as "Essex Note No. 1") and (2) $5,396,966.84, plus interest and attorney fees based on a Confession of Judgment received on February 10, 2011 in Powhatan County Circuit Court in Instrument No. 11-103, which is set forth in Proof of Claim No. 7 (Referred to herein as "Essex Note No. 2").

Essex Note No. 1 is secured by a Deed of Trust on 2.5 acres located at 807 Old Hundred Road, Midlothian, Virginia, owned by GBS. GBS believes that the value of the collateral is $450,000.00. Since Essex Note No. 1 was reduced to a judgment, it is a lien on all of the real estate owned by GBS as well as the 2.5 acres pledged as collateral for the loan. Essex Bank Note No. 1 is fully secured.

Essex Note No. 2 is secured by a Deed of Trust on 114$^{+/-}$ acres owned by GBS, located on Otterdale Road, Chesterfield, Virginia, as more particularly described in its Deed of Trust. GBS believes that the value of this collateral is $11,400,000. Since Essex Note No. 2 was reduced to a judgment, it has a judgment lien on all of the real estate owned by GBS as well as the 62.26 acres set forth in its Deed of Trust. This loan is fully secured.

Essex Bank's Claims shall be treated as follows:

1.      Essex Bank shall be subject to the terms set forth herein regarding the Rezoning Phase;

2.      Essex Bank shall be subject to the Secured Creditors' Obligations set forth in Section VI above;

3.      After final approval of the zoning modification application contemplated herein, the Debtor shall have three hundred sixty-five (365) days to market and sell the property that is subject to the Essex Bank Deed of Trust for either the amount owed to Essex Bank or any sum and on any terms and conditions that Essex Bank, in its sole discretion, may agree to accept. If the Debtor fails to do so, then Essex Bank shall have the option to either (a) foreclose on the land that serves as its collateral or (b) elect to take a Deed in Lieu of Foreclosure. If Essex Bank elects to take a Deed in Lieu of foreclosure, then the Debtor shall tender a deed within twenty-four (24) hours of that request;

4.      Essex Bank's judgment shall remain on all of the Property that it attached to under applicable non-bankruptcy law. However, Essex Bank shall release its judgment lien on any property that is not specifically described and pledged in its Deed of Trust for a release fee of five percent (5%) of the gross sales price of such property or such lower amount as Essex Bank may, in its sole discretion, agree to accept.

5.      Essex Bank shall maintain its Deed of Trust lien on the property as it existed on the date the Petition was filed.

The obligations owed to this creditor shall remain secured by the existing deed of trust, and that obligation shall continue to accrue interest from the Petition Date until the land is conveyed by sale, deed in lieu of foreclosure or foreclosure at the rate of five percent (5%) per annum. This creditor shall be entitled to reasonable costs and attorney's fees incurred related to this case and the Debtor's default.

The Claims of the Class 7 Creditor are impaired.

**Class 8:  Franklin Federal Savings and Loan:**  Class 8 consists of the Secured Claim of Franklin Federal Savings and Loan ("Franklin Federal") on property owned by GBS that is included in Proof of Claim No.4 in the principal amount of $5,295,693.59 as of June 23, 2011. Franklin Federal has a first deed of trust on approximately 301 acres. The Debtor believes that the fair market value of the land that is subject to Franklin Federal's lien is $12,200,000.00, based on Franklin Federal's pre-petition appraisal, which the Debtor believes more accurately values the land. Accordingly, Franklin Federal is over-secured.

Franklin Federal's Class 8 Claim shall be treated as follows:

1.      Franklin Federal shall be subject to the terms set forth herein in regarding the Zoning Modification Phase;

2.      Franklin Federal shall be subject to the Secured Creditors' Obligations set forth in Section VI above;

3.      After final approval of the zoning modification application contemplated herein, the Debtor shall have three hundred sixty-five (365) days to market and sell the property that is the subject to the Franklin Federal Deed of Trust for either the amount owed to Franklin Federal or any sum and on any terms and conditions that Franklin Federal, in its sole discretion, may

agree to accept. If the Debtor fails to do so, then Franklin Federal shall have the option to either (a) foreclose on the land that serves as its collateral or (b) elect to take a Deed in Lieu of Foreclosure. If Franklin Federal elects to take a Deed in Lieu of foreclosure, then the Debtor shall tender a deed within twenty-four (24) hours of that request;

4.    Franklin Federal shall maintain its Deed of Trust lien on the property as it existed on the date the Petition was filed.

The obligations owed to this creditor shall remain secured by the existing deed of trust, and that obligation shall continue to accrue interest from the Petition Date until the land is conveyed by sale, deed in lieu of foreclosure or foreclosure at the rate of five percent (5%) per annum. This creditor shall be entitled to reasonable costs and attorney's fees incurred related to this case and the Debtor's default. All real estate taxes paid by Franklin Federal, if any, shall be added to the balance due this creditor under the Deed of Trust Note it holds.

The Claims of the Class 8 Creditor are impaired.

**Class 9: Virginia Commonwealth Bank:**  Class 9 consists of the Secured Claim of Virginia Commonwealth Bank on property owned by GBS as set forth in Proof of Claim No. 17 filed on September 29, 2011. Virginia Commonwealth Bank has a first deed of trust on approximately 100 acres. The Debtor owes Virginia Commonwealth Bank approximately $1,778,471.78 as of September 29, 2011. The foregoing amount includes accrued interest and fees of $85,471.78 as of the date the Proof of Claim was filed. The Debtor believes that the fair market value of the land that is subject to Virginia Commonwealth Bank's lien is $4,600,000.00, based on a recent appraisal that this Bank has shared with the Debtor. Accordingly, Virginia Commonwealth Bank is over-secured.

Virginia Commonwealth Bank's Class 9 Claims shall be treated as follows:

1.    Virginia Commonwealth Bank shall be subject to the terms set forth herein regarding the Zoning Modification Phase;

2.    Virginia Commonwealth Bank shall be subject to the Secured Creditors' Obligations set forth in Section VI above;

3.    After final approval of the zoning modification application contemplated herein, the Debtor shall have three hundred sixty-five (365) days to market and sell the property that is the subject to the Virginia Commonwealth Bank Deed of Trust for either the amount owed to Virginia Commonwealth Bank or any sum and on any terms and conditions that Virginia Commonwealth Bank, in its sole discretion, may agree to accept. If the Debtor fails to do so, then Virginia Commonwealth Bank shall have the option to either (a) foreclose on the land that serves as its collateral, except the 27.8 acres that is designated as GPIN: 7147037259 as further depicted in Schedule 1 attached; or (b) elect to take a Deed in Lieu of Foreclosure on the land that serves as its collateral, except the 27.8 acres that is designated as GPIN: 7147037259. If Virginia Commonwealth Bank elects to take a Deed in Lieu of foreclosure, then the Debtor shall tender a deed within twenty-four (24) hours of that request and Virginia Commonwealth Bank

shall release its lien on the 27.8 acres that is designated as GPIN: 7147037259 as further depicted in Schedule 1 attached. That land shall remain as the sole collateral for the Class 10 Claimant.

4.      If Virginia Commonwealth Bank forecloses on its collateral, then it shall first foreclose on all of its collateral except the 27.8 acres that is designated as GPIN: 7147037259. If it receives full satisfaction of the amounts owed to it from that foreclosure, then it shall release its lien on the 27.8 acres that is designated as GPIN: 7147037259. However, if it does not receive full satisfaction from the foreclosure of the land excepting the 27.8 acres that is designated as GPIN: 7147037259, then it shall be permitted to foreclose on that land.

Except as modified herein, the obligations owed to this creditor shall remain secured by the existing deed of trust, and that obligation shall continue to accrue interest from the Petition Date until the land is conveyed by sale, deed in lieu of foreclosure or foreclosure at the rate of five percent (5%) per annum. This creditor shall be entitled to reasonable costs and attorney's fees incurred related to this case and the Debtor's default. All real estate taxes, if any, paid by Virginia Commonwealth Bank  shall be added to the balance due this creditor under the Deed of Trust Note it holds.

The Claims of the Class 9 Creditor are impaired.

**Class 10: Four K Associates:**  Four K Associates has a second deed of trust on approximately 75 acres. The Debtor owes Four K Associates $841,456.84 as of June 3, 2011, as set forth in Proof of Claim No. 11 filed on September 16, 2011. Virginia Commonwealth Bank has a first Deed of Trust on the parcel that secures this loan. The Debtor believes that the fair market value of the land that is subject to Four K Associates lien is $4,600,000.00, based on an appraisal done by Virginia Commonwealth Bank on the land.

Four K Associates' Class 10 Claims shall be treated as follows:

1.      Four K Associates shall be subject to the terms set forth herein regarding the Zoning Modification Phase;

2.      Four K Associates shall be subject to the Secured Creditors' Obligations set forth in Section VI above;

3.      After final approval of the zoning modification application contemplated herein, the Debtor shall have three hundred sixty-five (365) days to market and sell the property that is the subject to the Four K Associates' Second Deed of Trust for either the amount owed to Virginia Commonwealth Bank and Four K Associates or any sum and on any terms and conditions that Four K Associates, in its sole discretion, may agree to accept. If the Debtor fails to do so, then Four K Associates may elect one of the following remedies:  (a) foreclose on  its Second Deed of Trust as permitted by applicable non-bankruptcy law; or (b) stand still on its rights if Virginia Commonwealth Bank elects to foreclose on its Deed of Trust on all of its collateral except the property that is designated as GPIN: 7147037259 as further depicted in Schedule 1 attached. If Virginia Commonwealth receives full satisfaction from the sale of part of its collateral, then Four K Associates will become the first lienholder on the property that is

designated as as GPIN: 7147037259 as further depicted in Schedule 1 attached  and  may then elect to take a Deed in Lieu of Foreclosure on the 27.8 acres that is designated as GPIN: 7147037259. If Four K Associates elects to take a Deed in Lieu of foreclosure, then the Debtor shall tender a deed within twenty-four (24) hours of that request. In the alternative, Four K Associates may elect to foreclose on the 27.8 acres that is designated as GPIN: 7147037259

Except as modified herein, the obligations owed to this creditor shall remain secured by the existing deed of trust, and that obligation shall continue to accrue interest from the Petition Date until the land is conveyed by sale, deed in lieu of foreclosure or foreclosure at the rate of five percent (5%) per annum. This creditor shall be entitled to reasonable costs and attorney's fees incurred related to this case and the Debtor's default. All real estate taxes, if any, paid by this creditor shall be added to the balance due this creditor under the Deed of Trust Note it holds.

The Claims of the Class 10 Creditor are impaired.

**Class 11: Paragon Bank:**  Class 11 consists of the Secured Claim of Paragon Bank on property owned by GBS.  Paragon Bank has a first deed of trust on approximately 42 acres. The Debtor believes that it owes Paragon Bank approximately $2,056,564.56 as of September 27, 2011 as set forth in Proof of Claim No. 13 filed by Paragon Bank. The principal balance is $1,905,581.56 as of September 27, 2011, according to the Proof of Claim filed. GBS believes that the fair market value of the land that is subject to Paragon Bank's first deed of trust lien is $4,200,000.00, based on Paragon Bank's Proof of Claim. Accordingly, Paragon Bank is over-secured.

Paragon Bank's Class 11 Claims shall be treated as follows:

1.      Paragon Bank shall be subject to the terms set forth herein regarding the Zoning Modification Phase;

2.      Paragon Bank shall be subject to the Secured Creditors' Obligations set forth in Section VI above;

3.      After final approval of the zoning modification application contemplated herein, the Debtor shall have three hundred sixty-five (365) days to market and sell the property that is the subject to the Paragon Bank Deed of Trust for either the amount owed to Paragon Bank or any sum and on any terms and conditions that Paragon Bank, in its sole discretion, may agree to accept. If the Debtor fails to do so, then   Paragon Bank shall have the option to either (a) foreclose on the land that serves as its collateral or (b) elect to take a Deed in Lieu of Foreclosure. If Paragon Bank elects to take a Deed in Lieu of foreclosure, then the Debtor shall tender a deed within twenty-four (24) hours of that request; and

4.      Paragon Bank shall maintain its Deed of Trust lien on the property as it existed on the date the Petition was filed.

The obligations owed to this creditor shall remain secured by the existing deed of trust, and that obligation shall continue to accrue interest from the Petition Date until the land is conveyed by sale, deed in lieu of foreclosure or foreclosure at the rate of five percent (5%) per

annum. This creditor shall be entitled to reasonable costs and attorney's fees incurred related to this case and the Debtor's default. All real estate taxes paid, if any, by Paragon Bank shall be added to the balance due this creditor under the Deed of Trust Note it holds.

The Claims of the Class 11 Creditor are impaired.

**Class 12:   Mr. Walter F. Styles:**  Class 12 consists of the Purchase-Money Secured Claim of Walter F. Styles on property owned by GBS that is included in Proof of Claim No.3 in the principal amount of $748,110.66 as of June 22, 2011.  Mr. Styles has a first deed of trust on approximately 87$^{+/-}$ acres. The Debtor believes that the fair market value of the land that is subject to Mr. Styles' lien is $1,364,000.00, based on Mr. Styles' Proof of Claim. Accordingly, Mr. Styles is over-secured.

Mr. Styles' Class 12 Claim shall be treated as follows:

1.      Mr. Styles shall be subject to the terms set forth herein regarding the Zoning Modification Phase;

2.      Mr. Styles shall be subject to the Secured Creditors' Obligations set forth in Section VI.

3.      After final approval of the zoning modification application contemplated herein, the Debtor shall have three hundred sixty-five (365) days to market and sell the property that is subject to Mr. Styles' Deed of Trust for either the amount owed to Mr. Styles or any sum and on any terms and conditions that Mr. Styles, in his sole discretion, may agree to accept. If the Debtor fails to do so, then Mr. Styles shall have the option to either (a) foreclose on the land that serves as his collateral or (b) elect to take a Deed in Lieu of Foreclosure. If Mr. Styles elects to take a Deed in Lieu of foreclosure, then the Debtor shall tender a deed within twenty-four (24) hours of that request; and

4.      Mr. Styles shall maintain his Deed of Trust lien on the property as it existed on the date the Petition was filed.

The obligations owed to this creditor shall remain secured by the existing deed of trust, and that obligation shall continue to accrue interest from the Petition Date until the land is conveyed by sale, deed in lieu of foreclosure or foreclosure at the rate of five percent (5%) per annum. This creditor shall be entitled to reasonable costs and attorney's fees incurred related to this case and the Debtor's default.

The Claims of the Class 12 Creditor are impaired.

**Class 13: Central Virginia Bank:**  Class 13 consists of the Secured Claim of Central Virginia Bank ("CVB") on property owned by GBS that is included in Proof of Claim No. 2 in the principal amount of $6,222,014.12 as of June 20, 2011. CVB has a first deed of trust on approximately 265 acres. The Debtor believes that the fair market value of the land that is subject to CVB's lien is $ 10,600,000, based on earlier appraisals and the per-acre values that

are reflected in a recent appraisal commissioned by Virginia Commonwealth Bank on land that adjoins the land that CVB has as collateral. . Accordingly, CVB is over-secured.

CVB's Class 13 Claims shall be treated as follows:

1.      CVB shall be subject to the terms set forth herein regarding the Zoning Modification Phase;

2.      CVB shall be subject to the Secured Creditors' Obligations set forth in Section VI above;

3.      After final approval of the zoning modification application contemplated herein, the Debtor shall have three hundred sixty-five (365) days to market and sell the property that is subject to the CVB Deed of Trust for either the amount owed to CVB or any sum and on any terms and conditions that CVB, in its sole discretion, may agree to accept. If the Debtor fails to do so, then   CVB shall have the option to either (a) foreclose on the land that serves as its collateral or (b) elect to take a Deed in Lieu of Foreclosure. If CVB elects to take a Deed in Lieu of foreclosure, then the Debtor shall tender a deed within twenty-four (24) hours of that request; and

4.      CVB shall maintain its Deed of Trust lien on the property as it existed on the date the Petition was filed.

The obligations owed to this creditor shall remain secured by the existing deed of trust, and that obligation shall continue to accrue interest from the Petition Date until the land is conveyed by sale, deed in lieu of foreclosure or foreclosure at the rate of five percent (5%) per annum. This creditor shall be entitled to reasonable costs and attorney's fees incurred related to this case and the Debtor's default. All real estate taxes paid, if any, by this creditor shall be added to the balance due this creditor under the Deed of Trust Note it holds.

The Claims of the Class 13 Creditor are impaired.

**Class 14: Mrs. Donese B. Smith:**  Class 14 consists of the Secured Claim of Donese B. Smith ("Mrs. Smith") on 16.63 acres on Old Hundred Road, Midlothian, Virginia, that is included in Proof of Claim No.14 in the principal amount of $400,000.00 as of September 29, 2011, plus accrued interest and fees of $26,695.75. Mrs. Smith has a purchase-money first deed of trust duly recorded against the property. The Debtor believes that the fair market value of the land that is subject to Mrs. Smith's lien is $1,000,000.00, based on Mrs. Smith's Proof of Claim. Accordingly, Mrs. Smith is over-secured.

Mrs. Smith's Class 14 Claim shall be treated as follows:

1.      Mrs. Smith shall be subject to the terms set forth herein regarding the Zoning Modification Phase;

2.      Mrs. Smith shall be subject to the Secured Creditors' Obligations set forth in Section VI.

3.      After final approval of the rezoning application contemplated herein, the Debtor shall have three hundred sixty-five (365) days to market and sell the property that is subject to Mrs. Smith's Deed of Trust for either the amount owed to Mrs. Smith or any sum and on any terms and conditions that Mrs. Smith, in her sole discretion, may agree to accept. If the Debtor fails to do so, then Mrs. Smith shall have the option to either (a) foreclose on the land that serves as her collateral or (b) elect to take a Deed in Lieu of Foreclosure. If Mrs. Smith elects to take a Deed in Lieu of foreclosure, then the Debtor shall tender a deed within twenty-four (24) hours of that request; and

4.      Mrs. Smith shall maintain her Deed of Trust lien on the property as it existed on the date the Petition was filed.

The obligations owed to this creditor shall remain secured by the existing deed of trust, and that obligation shall continue to accrue interest from the Petition Date until the land is conveyed by sale, deed in lieu of foreclosure or foreclosure at the rate of five percent (5%) per annum. This creditor shall be entitled to reasonable costs and attorney's fees incurred related to this case and the Debtor's default.

The Claims of the Class 14 Creditor are impaired.

**Class 15:  Ally Financial Inc., f/k/a GMAC, Inc.:**  Class 15 consists of the Secured Claim of Alley Financial, Inc. ("Ally") on a 2009 Chevrolet Suburban Truck owned by GBS that is included in Proof of Claim No.1. The principal amount is $31,231.25 as of June 10, 2011. Ally has a perfected security interest on the vehicle. The monthly payments due on the loan are $867.52. The final payment on the five (5)-year loan is due on May 15, 2014. The Debtor believes that the fair market value of the vehicle that is subject to Ally's lien is $32,000.00. Accordingly, Ally is fully secured.

The Debtor will pay Ally $867.52, including interest, on the outstanding principal balance as required by the loan agreement and comply with all other terms in the Loan Agreement. The Debtor believes that it is current on the payments on this loan.

The claims of Ally are unimpaired.

Ally shall be deemed fully secured and shall maintain all perfected security interests in the vehicle that serves as security for its loan.

**Class 16: Secured Real Estate Taxes Owed to Chesterfield County:**  Class 16 consists of the Secured Claims of the County of Chesterfield, which are real property taxes imposed on real estate owned by GBS as set forth in Proof of Claim No. 5 in the amount of $227,088.68 filed by the County of Chesterfield on June 28, 2011. There are additional real estate taxes that have accrued and are due post-petition. The amounts owed to Chesterfield County for real estate taxes are secured under applicable non-bankruptcy law.

The Class 16 Claimant shall receive all of the taxes owed on each parcel when that parcel is sold by the Debtors or the secured creditors under a foreclosure action. Until the property is sold, the Class 3 Claimant shall maintain its lien on the property as set forth in applicable non-bankruptcy law.

Class 16 Claims are impaired.

**Class 17:  GBS Holding, Ltd.'s Unsecured Creditors, Excluding Insider Claims:**
Class 17 consists of all allowed Unsecured Claimants of GBS, excluding the claims of Insiders. The Debtor estimates that the total amount owed to the claimants in this class is less than $121,000.00.

The amount that the unsecured creditors in this Class will receive is dependent on whether or not the Debtor is successful during the Marketing Phase, as described herein, in selling one or more parcels for more than what is owed to the secured creditor with a lien on that parcel.  If the Debtor is completely unsuccessful in selling any of the parcels for more than what is owed on each parcel, then the creditors in this Class would not receive any dividend from the sale of the Debtor's real estate holdings.  Notwithstanding that fact, the Debtor will escrow the sum of $12,100.00 from the funds it receives from the timbering of the property owned by GBS. This amount represents approximately 10 % of the total amount of claims held by the creditors in this Class.  This amount will be disbursed to the creditors on or before the second anniversary of the Effective Date.  This is the minimum amount that the creditors in this Class shall receive.  If the Debtor is able to sell any parcels for more than what is owed to the secured creditor with a lien on each parcel, then the Debtor shall make distributions on a pro rata basis to the holders of claims in this Class until such time as they are paid either all of those funds or 100% of the amount of their claim.  The escrow account shall be established in a special account, within thirty-six hours after the Debtor receives the funds from the selective timbering, at Essex Bank. The name of the disbursing agent for this account shall be Robert W. Hansen, CPA. Any interest generated by this special account shall belong to the Debtor.

The Class 17 Claim holders are impaired.

**Class 18:  GBS Holding, Ltd.'s Unsecured Insider Claims:**  Class 18 consists of all allowed Unsecured Insider Claimants of GBS.

The Class 18 claimholders shall not receive any distribution unless the holders of all claims in Class 4 have received 100% of their allowed claims.  If the creditors in Class 4 receive 100% of their allowed claims, then the holders of Class 5 claims shall be entitled to receive a pro rata distribution, not to exceed 100% of their claims, from amounts generated by the Debtor from the sale of its property above the amounts due to the secured creditors with liens on those parcels.  Distribution to the holders of this class will only occur after all of the claims of Class 4 are paid in full.

The Class 18 claims are impaired.

**Class 19:  Equity Holders in GBS Holding, Ltd.:**  Class 19 consists of George B. Sowers, Jr.'s equity interests in the Debtor. He is the sole shareholder in GBS. The Class 19 Equity holders shall only receive amounts, if any, that remain after all of the land is sold or returned to the secured creditor that has a lien on the land and all Class 17 and Class 18 claimants are paid in full.

**Class 20:  Creditors that have Guarantees from GBS Holding, Ltd.:**  Class 20 consists of unsecured creditors that have a guarantee of payment from GBS in connection with an obligation owed by an entity other than GBS. Included in the claims of this class are Claims of Citizens and Farmers Bank as set forth in their Proof of Claims No. 15 and 16. The creditors in this Class are all secured by real estate or other collateral that serves as the primary collateral for the debt that is owed to them. The Debtors believe that the value of each creditor's collateral in all cases exceeds the amount owed to that creditor. The Debtors propose that all unsecured creditors that merely have a guarantee of payment from GBS receive nothing for their guarantee claims and that those guarantees are extinguished upon confirmation of the Plan. The Plan provides that all creditors of Roseland Village and/or GBS that have guarantees from the insiders, officers, members, employees and their spouses will also be enjoined from seeking payment from the guarantors during the period that the confirmed Plan of Reorganization is being consummated by the Debtors.

## V. SOLICITATION OF PLAN APPROVAL

**THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN DAYLIGHT TIME, ON _____, 2013 (THE "VOTING DEADLINE"), UNLESS EXTENDED BY THE DEBTORS WITH THE APPROVAL OF THE BANKRUPTCY COURT.  IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY DURRETTECRUMP PLC (ATTENTION:  BRUCE E. ARKEMA), BANK OF AMERICA CENTER, 1111 EAST MAIN STREET, 16TH FLOOR, RICHMOND, VIRGINIA 23219 ON OR PRIOR TO THE VOTING DEADLINE.**

Upon the terms and subject to the conditions set forth in this Disclosure Statement and in the accompanying Ballot, the Debtors are soliciting acceptances of the Plan from claimants eligible to vote.  Your vote on whether to accept or reject the Plan is important.  Although this Disclosure Statement summarizes the Plan, you should read the Plan in its entirety.  To adopt the Plan, the Debtors must receive acceptances of the Plan from: (1) claimants eligible to vote holding at least two thirds (2/3) of the principal amount of each Class of Claims entitled to vote on the Plan actually voting on the Plan, and (2) more than one half (1/2) in number of the holders of such Claims that actually vote on the Plan (the "Requisite Acceptances").  Because only those holders who vote to accept or reject the Plan will be counted for purposes of determining acceptance or rejection of the Plan, the Plan could be approved by the affirmative vote of claimants eligible to vote holding significantly less than two thirds (2/3) of the aggregate principal amount of each class of Claims entitled to vote on the Plan, and less than one half (1/2) in number of the claimants eligible to vote with respect to each such Class.  Even if the Plan is

accepted by the Classes entitled to vote, it will remain subject to review by and approval of the
Bankruptcy Court.

**A COPY OF THE PLAN IS ATTACHED TO THIS
DISCLOSURE STATEMENT AS <u>EXHIBIT 1</u> AND IS
INCORPORATED HEREIN BY REFERENCE.  THE
FOLLOWING IS A SUMMARY OF THE MATERIAL
PROVISIONS OF THE PLAN.  YOU SHOULD
CAREFULLY READ THE PLAN IN ITS ENTIRETY FOR A
FULL UNDERSTANDING OF ITS TERMS.**

A.      Explanation of Chapter 11 Reorganization.

        Chapter 11 of the Bankruptcy Code is the principal business reorganization chapter of
the Bankruptcy Code.  Under Chapter 11, a debtor is authorized to reorganize its business for
the benefit of itself and its creditors and equity holders.  In addition to permitting the
rehabilitation of the debtor, another goal of Chapter 11 is to promote equality of treatment of
creditors and equity holders of equal rank with respect to the distribution of a debtor's assets.  In
furtherance of these two goals, upon the filing of a petition for reorganization under Chapter 11,
Bankruptcy Code § 362 generally provides for an automatic stay of substantially all acts and
proceedings against the debtor and its property, including all attempts to collect claims or to
enforce liens that arose prior to the commencement of the debtor's case under Chapter 11.

        Approval and confirmation of a plan of reorganization by a Bankruptcy Court is the
principal objective of a Chapter 11 case.  In general, a Chapter 11 plan of reorganization:

        ·       divides claims and equity interests into separate classes,

        ·       specifies the property that each class is to receive under the plan, and

        ·       contains other provisions necessary or desirable for the reorganization of the
                debtor.

        In general, there are two forms of treatment that may be provided to a holder of a claim
or equity interest under a Chapter 11 plan of reorganization:  "unimpaired" treatment and
"impaired" treatment.  Unimpaired treatment means that the legal, equitable and contractual
rights of a holder of a claim or equity interest are unchanged under the Plan.  Impaired treatment
means that the legal, equitable or contractual rights of a holder of a claim or equity interest are
somehow changed under the Plan and can include situations where a holder of a claim or equity
interest does not receive or retain any property under a plan.

        In Chapter 11, the right to vote on a plan of reorganization is determined by the treatment
that a particular holder of a claim or equity interest receives under the Plan.  If the holder of a
claim or equity interest is unimpaired under a plan, the holder is deemed to accept the Plan, and
it is therefore unnecessary to solicit such holder's vote on the Plan.  Similarly, it is not necessary
to solicit a vote from a holder of a claim or equity interest that is not entitled to receive or retain

any property under a plan, and such holder is deemed to reject the Plan under the Bankruptcy Code. However, if an impaired holder of a claim or equity interest is entitled to receive property under the Plan, then such holder is not deemed to automatically accept or reject the Plan and, therefore, should vote on the Plan.

Chapter 11 of the Bankruptcy Code, however, does not require each holder of a claim or equity interest in a voting class to vote in favor of a plan of reorganization in order for the Bankruptcy Court to confirm the Plan. Instead, in order for a particular class to accept a plan, acceptances must be received:

· if such class is a class of claims against a debtor, from the holders of claims constituting at least two-thirds (2/3) in dollar amount of the allowed claims actually voting in such class and more than one-half (1/2) in number of the holders of allowed claims actually voted in such class; or

· if such class is a class of equity interests in a debtor, from the holders of at least two-thirds (2/3) in amount of the allowed equity interests in such class of equity interests that have actually voted to accept or reject the plan.

In addition to the voting requirements described above, the Bankruptcy Court must also find that the plan of reorganization meets a number of statutory tests before the Court may confirm (approve) the plan of reorganization. Many of these tests are designed to protect the interests of holders of claims or equity interests who do not vote to accept the plan of reorganization but who will nonetheless be bound by the Plan's provisions if it is confirmed by the Bankruptcy Court.

B.     Disclosure Statement.

Bankruptcy Code § 1125(a) defines "adequate information" as information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of a company and the condition of such company's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or equity interests of the relevant class to make an informed judgment about the plan of reorganization. The Debtors believe that this Disclosure Statement contains adequate information for holders to cast an informed vote to accept or reject the Plan and that this Disclosure Statement and the solicitation of acceptances comply with applicable provisions of the Bankruptcy Code [including sections 1125(a) and 1126(b)], the Bankruptcy Rules and non-bankruptcy law, to the extent applicable. The Debtors also believe that properly executed Ballots comply with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules concerning plan acceptances.

This Disclosure Statement, together with the Plan, is being transmitted to all known eligible voters. Although there is no specified period during which the Debtors are legally required to keep the solicitation open, the Debtors will keep this solicitation open until the Voting Deadline.

C.    Voting on the Plan.

As more fully described above, only impaired classes of claims and equity interests are entitled to vote on a plan of reorganization. The Plan designates twenty (20) separate classes of Claims, including the equity interest holders in Roseland Village and GBS Holding. The Debtors are soliciting the votes of all the Classes.

The solicitation of acceptances of the Plan will expire on _____, 2013, unless extended by the Debtors.

D.    Classifications of Claims and Equity Interests.

Bankruptcy Code § 1123 provides that a plan of reorganization must classify claims against any equity interests in a debtor. Under Bankruptcy Code § 1122, a plan must classify each right to payment against the debtor and each right to an equitable remedy for breach of performance that gives rise to a right to payment (collectively, a "Claim") and any interest in the debtor represented by an equity security into a category or class (a "Class") that contains substantially similar Claims and equity interests. The Plan divides the Claims of known creditors and the equity interests of equity holders into Classes and sets forth the treatment offered each Class. The Debtors believe they have classified all Claims and equity interests in compliance with the provisions of Section 1122, but it is possible that a creditor or equity interest holder may challenge the Debtors' classification of Claims and equity interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In such event, it is the Debtors' present intention, to the extent permitted by the Bankruptcy Code and the provisions of the Plan, to make modifications of the classification of Claims or equity interests that are required by the Bankruptcy Court for confirmation.

## VI.  OTHER DISCLOSURES

A.    Court Approval.

Note that Court approval of this Disclosure Statement is not a decision by the Court on the merits of the Plan.

B.    Insider Claims.

There are insider claims in these cases, and the treatment of those claims is clearly set forth herein.

C.    Transactions With Insiders.

The Debtors are not aware of any insider transactions, except that insiders and/or entities affiliated with insiders have made unsecured post-petition loans, in the ordinary course of business, to the Debtors for operating expenses.

D.    <u>Disputed Claims</u>.

The Debtors have not objected to any claims but reserve the right to do so at any time prior to 90 days following the Effective Date.

E.    <u>U.S. Trustee Fees</u>.

U.S. Trustee fees will be paid until the case is converted, dismissed or closed, and post-confirmation quarterly fees will be timely paid as required by law.

F.    <u>Administrative Expenses</u>.

These consist of U.S. Trustee fees (which are current) and professional fees for the attorneys and accountants.  The Debtors estimate that total allowable professional fees (inclusive of retainers) will be between $110,000.00 and $120,000.00.

G.    <u>Legal Proceedings</u>.

The Debtors have not instituted any legal proceedings against any third party at this time.

## VII.  CONCLUSION

The Debtors believe that the reorganization of the Debtors, as set forth in the Plan of Reorganization and summarized in this Disclosure Statement, is in the best interests of the creditors of each of the Debtors' estates and other interested parties and urges all concerned to vote to approve the Plan of Reorganization.

ROSELAND VILLAGE, LLC,
and
GBS HOLDING, LTD.

By:  _/s/ George B. Sowers, Jr._____


_____/s/ Bruce E. Arkema_____
Bruce E. Arkema (VSB No. 18625)
Kevin J. Funk (VSB No. 65465)
DurretteCrump, PLC
Bank of America Center
1111 East Main Street, 16th Floor
Richmond, Virginia  23219
Telephone: (804) 775-6900
Facsimile:  (804) 775-6911
    *Counsel for Roseland Village, LLC and GBS Holding, Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 6th day of March, 2013, a true and accurate copy of the foregoing Disclosure Statement was served, via the Court's ECF system, on Robert B. Van Arsdale, Esquire (Robert.B.Van.Arsdale@usdoj.gov).


/s/ Bruce E. Arkema_____